UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No.: 1:07-CR-29 |
| | ) | |
| CARLOS VALENSIA | ) | |

**MEMORANDUM OF OPINION AND ORDER**

This matter is before the court on the Motion to Suppress filed by the Defendant, Carlos Valensia ("Valensia") on April 30, 2007. The court held an evidentiary hearing on the motion on May 25, 2007. On July 25, 2007, Valensia filed a further brief in support of his motion. The United States of America ("the government") filed a response in opposition to the motion on August 24, 2007, and Valensia filed a reply brief on September 10, 2007. For the reasons discussed in this Order, the motion to suppress is DENIED.

**BACKGROUND**

Valensia has been charged by way of an Indictment with two felony counts. Indictment, Docket at 15. He is accused of violating 21 U.S.C. §841(a)(1) for allegedly possessing marijuana with intent to distribute and 18 U.S.C. § 924(c) for allegedly possessing a firearm in furtherance of a drug trafficking crime. *Id*. The charges stem from events that occurred on March 7, 2007, when Fort Wayne Police officers went to Valensia's apartment and discovered many pounds of marijuana and a firearm. It is uncontested that the police officers did not have a warrant when they went to the apartment. The officers went to the apartment that day after having received an anonymous "tip" that marijuana and a firearm were present at the residence. Valensia challenges the search and seizure of the contraband on several grounds. He claims that the officers did not have probable cause to enter the apartment or search it, that Valensia never

gave consent to a search of his apartment, and that he was not informed of his *Miranda* rights either at the apartment or later at the police station when he was questioned.  Valensia seeks to suppress the admission of all the evidence found in the apartment as well as all statements he made to police officers during his interrogation subsequent to his arrest.

On the morning of March 7, 2007, Joel Musi, a "drug house" coordinator at the Fort Wayne Police Department Narcotics Bureau, received an anonymous phone call during which the caller reported seeing 70 pounds of marijuana and an AK-47 firearm in an apartment in Canterbury Green, an apartment complex on the northeast side of Fort Wayne.  Opposition to Defendant's Motion to Suppress ("Government's Response"), Docket at 31, p. 1; Transcript of Proceedings of May 25, 2007, pp. 6, 69-70.[1]  The caller told Musi that Carlos Valensia and Kayla Sellers ("Sellers") resided at the apartment and that both individuals were present in the apartment on the morning in question.  Tr., p. 70.  The caller also informed Musi that there was a young child in the apartment.  *Id*.

Musi called the apartment complex and obtained the precise apartment number for Valensia's apartment, which was 2807 Northgate, Apartment number 1.  *Id*.  Musi then spoke to Fort Wayne Police Officer Miguel Rivera and told him about the anonymous "tip."  *Id*., p. 72.  Rivera suggested that they attempt a "knock and talk" at the apartment, meaning that they would simply go to the apartment, knock on the door, and see if the residents would speak to them.  *Id*., p. 7.  Rivera and Musi went to the parking lot of a nightclub located very near the apartment complex, where they met with another Fort Wayne Police Officer, Robert Abels.  *Id*., pp. 8, 84,

---

[1] The transcript of the hearing conducted in this case is referenced throughout this Order and is cited as "Tr., p. __."

126; see also, Government's Exhibit 16 (Incident Report).  Rivera and Musi were both in plain clothes and decided to call for a uniformed police officer to go with them to the apartment.  Tr., pp. 84 and 126.  Musi made the call for uniform "back up" at 10:28 a.m.  *Id*.

Musi, Rivera and Abels then went to the apartment complex and entered a common hallway of the building in which Valensia's apartment was located.  Tr., pp. 9-10.  This hallway is unlocked and is accessible to the public.  *Id*.  When they entered the hallway of the building, the officers could smell marijuana.  *Id*., pp. 9-12, 72-73, and 85.  Rivera testified that there was the smell of burnt marijuana as well as the smell of a large quantity of marijuana.  *Id*.  Rivera testified that the smell of marijuana in the common hallway was "overpowering."  *Id*., p. 12.

Rivera went to the door of apartment number one and could hear people inside laughing.  *Id*.  He also testified that the smell of marijuana was emanating from the apartment through a crack in the door.  *Id*.  Rivera knocked on the door and the sounds coming from inside the apartment ceased.  *Id*.  Receiving no response, Rivera knocked on the apartment door a second time.  *Id*.  He heard the lock or deadbolt on the door being turned.  *Id*.  He knocked a third time and a voice inside asked who was at the door.  *Id*., pp. 14, 73.  Rivera responded by saying it was "maintenance," and the person inside asked if they could come back later.  *Id*., p. 14.  Rivera responded by saying that it would not take long, at which point Valensia answered the door.  *Id*.  According to the testimony of the officers, the smell of marijuana became even stronger once Valensia opened the door.  *Id*., pp. 15-16, 73, 88.  When Valensia opened the door, Officer Abels, in uniform, was standing in front of the doorway, while Officer Rivera, who had a badge visible on his chest, stood beside him.  *Id*., p. 15.  Rivera informed Valensia that there had been a complaint about the marijuana and Valensia allegedly admitted that he and his friends had been

3

smoking it.  *Id*., pp. 15-16.  The officers asked if they could enter the apartment, and Valensia moved away from the door and gestured for them to enter.  *Id*., pp. 16, 60, 74, 92.

      Rivera testified that when he entered the apartment he saw a bag of marijuana in plain view in a mail holder located on a kitchen wall.  *Id*., pp. 16, 22, 25.  In the living room of the apartment were two females, later identified as Kayla Sellers and Nicole Elkins.  *Id*., pp. 16-18, 107; Exhs. 2 and 3.  There were also two small children present in the apartment.  *Id*., pp. 16-18.  Another adult male, later identified as Jonathan McCain, was in a bedroom and was observed poking his head in and out of the bedroom door.  *Id*., pp. 16, 86.  At the direction of the officers, McCain eventually came out of the bedroom and into the living room.  *Id*., p. 21.  At that point, according to the testimony of the officers, every one was in the living room and the officers asked Valensia if there were any weapons on the premises.  *Id*., p. 22.  At first, Valensia said nothing, but then he answered that he had an "AK" on a shelf in his bedroom.  *Id*.  At that point, Rivera testified, he advised all of the occupants of their *Miranda* rights.  *Id*.  Rivera then made a call to Fort Wayne Police Communications, stated that he had just read *Miranda* rights to the people present, and requested a "time stamp."  *Id*., p. 23.  That call was made at 10:42 a.m.  *Id*.  According to Rivera's testimony, all the people present stated that they understood their rights and Valensia himself agreed to waive his rights and speak to the officers.  *Id*., pp. 23-24.  When Rivera interviewed Valensia later at the police station, he once again advised Valensia of his rights.  *Id*., pp. 53-56.  Rivera also had Valensia sign an "advisement of rights and waiver form" indicating that he had been informed of his rights, was waiving his rights, and that he understood that he had waived them earlier in his apartment.  *Id*.; Exhs. 9 and 10.

      While still in the apartment, Rivera asked Valensia for permission to retrieve the weapon

4

that Valensia had admitted was in the bedroom.  *Id*., p. 24.  Valensia allegedly consented, at which point Rivera and Abels went into the bedroom.  *Id*.  The weapon was on a closet shelf as Valensia had said.  *Id*.; Exh. 13.  The weapon was loaded, so Rivera removed the ammunition and placed the weapon back on the shelf.  *Id*., p. 29.  Under the shelf where the weapon was located the officers saw, in plain view according to them, several bundles of marijuana.  *Id*., pp. 28-30, 64; Exh. 14.  In the bathroom, also allegedly in plain view, was a bowl containing marijuana residue, a ledger book, and wrapping paper.  *Id*., pp. 27-29; Exh. 13.

Rivera and Abels then walked back into the living room and informed Valensia about what they had found, but Valensia said nothing in response.  *Id*., pp. 29-30.  At that point, the officers called for Fort Wayne Narcotics officers to come and assist.  *Id*.  When the additional officers arrived, Rivera got Consent to Search and Advisement of Rights forms from his car, and again advised Valensia and Sellers of their rights.  *Id*.  Officer Theresa Smith, who was one of the additional officers who came to the scene, obtained consent from Valensia and Sellers to search the apartment.  *Id*., pp. 34-35, 99-101; Exh. 8.  According to the officers' testimony, Valensia and Sellers were seated together on a couch in the living room when Smith read the consent form to both of them.  *Id*., p. 100.  According to Smith, Sellers was visibly upset but Valensia told her it would be okay and to sign the consent form.  *Id*., pp. 35, 100.  Sellers signed the consent form.  *Id*.  Rivera testified that he thought Valensia had also signed the consent form at the same time, but he noticed at the police station that only Sellers had signed it.  *Id*., p. 35.  Rivera testified that the showed the form to Valensia, asked if he remembered it and had given verbal consent to search, and Valensia responded affirmatively.  *Id*., pp. 35, 45; Exh. 10.  Rivera then asked Valensia to sign the form, which he did.  *Id*., p. 36.  Rivera and Smith both testified

5

that Valensia and Sellers had been informed of their rights and indicated that they understood those rights.  *Id*., pp. 97-98; Exh. 7.

After Valensia and Sellers had been informed of their rights and had signed consent and/or waiver of rights forms, the officers collected evidence in the apartment.  *Id*., p. 37.  Evidence obtained included bundles of marijuana, the AK firearm, the ledger, the packing materials and approximately $11,500 in cash.  *Id*.  The cash was found in a safe located that Valensia had opened for the officers.  *Id*., p. 37.[2]  After the evidence was collected, Valensia was taken to the police station for additional interviewing and questioning, while the other people present in the apartment were released.  *Id*., pp. 39-41.  At the station, as stated earlier, Valensia again waived his rights, agreed to speak with officers, and confirmed that he had consented to a search of the apartment (by signing a consent form that had already been signed by Sellers).  *Id*., pp. 45, 47, 53-56; Exhs. 8, 9, and 10.  The interview of Valensia by police was videotaped and Valensia described how he had become involved in drug trafficking.  *Id*., p. 40; Exh. 10.

## DISCUSSION

In his motion to suppress, Valensia raises several issues with the events that took place on March 7, 2007.  He challenges the officers' right to go to his apartment based on a lack of probable cause; the warrantless search of his apartment and the seizure of evidence, which he claims was done without knowing consent; and the interview of him that was conducted at the police station, which he contends was "tainted" by his "illegal arrest" at his apartment.  Brief in Support of Motion to Suppress Evidence (Defendant's Brief), Docket at 30.  The motion itself

---

[2] Also in the safe was a portion of a lease agreement indicating that Valensia and Sellers were renting the apartment together.  Exh. 4.

6

states numerous different grounds for challenging all the events that took place on March 7, 2007.  Valensia's motion states that "there was insufficient evidence to support probable cause that any illegal contraband was contained at [Valensia's and Sellers's apartment]"; that police officers "without lawful authority entered Defendant Valensia's apartment, exceeding the areas upon which visitors would be expected to be invited"; that "the search of Valensia's apartment and person, without the issuance of a warrant, violates . . . Valensia's right under the Fourth Amendment . . . ."; that "Valensia did not give valid consent to the search of seizure complained of"; that "Valensia did not knowingly and fully waive his rights to remain silent and not otherwise incriminate himself[.]"; and he was "incapable and unable to appreciate and understand the full meaning of his <u>Miranda</u> rights" due to "the physical, physiological, mental, emotional, educational and/or psychological state, capacity and condition of Defendant Valensia . . ."; and that "law enforcement officers lacked any reason to believe that the third party whom they asked to consent to the search had actual authority to grant the consent, and in fact, the third party did not properly grant consent."  Motion to Suppress, Docket at 23, pp. 1-6.

In his brief in support of his motion, Valensia condenses these issues and restates them as follows:

1.  Can information from an "anonymous tipster" be considered reliable?

2.  Was this a lawful search incident to Defendant Valensia's arrest in his home?

3.  Was the signing of the consent to search the premises by the occupants knowing and voluntary?

4.  If Defendant Valensia's arrest was "illegal," does this taint the Waiver of Rights signed at the Fort Wayne Police Department?

5.  Can law enforcement officers rely upon "exigent circumstances" in order to avoid the necessity of a search warrant?

7

Defendant's Brief, p. 2.  In a brief Valensia filed in April 2007 along with his motion to suppress, he stated the issues as follows:

> A.  Were the law enforcement officers required to obtain a search warrant?
>
> B.  Defendant Valensia was not properly advised of his rights.
>
> C.  Can law enforcement officers rely upon "exigent circumstances" in order to avoid the necessity of a search warrant?

Memorandum in Support of Motion to Suppress, Docket at 24, pp. 1-2.  Thus, Valensia has presented several different grounds for his motion to suppress, and they have been phrased a variety of ways in his pleadings.

The court would restate and consolidate the issues even further.  Notwithstanding the many different ways Valensia states and/or frames his arguments, the issues to be resolved in this case are: 1) whether the police had a valid reason to enter Valensia's and Sellers's apartment in the first place; 2) whether the search of the apartment and the arrest of Valensia were in violation of the Fourth Amendment; and 3) whether Valensia knowingly waived his rights when he agreed to talk to officers at the police station.  All of the other "issues" Valensia raises in his pleadings are actually sub-issues or factual disputes arising within the context of the three main issues stated by the court.

The Fourth Amendment protects citizens from unreasonable searches and seizures. "Warrantless searches are presumptively unreasonable under the Fourth Amendment, but are permissible when the defendant voluntarily consents to the search."  *United States v. Strache*, 202 F.3d 980, 984 (7th Cir. 2000).  However, "the prohibition on warrantless searches does not apply to situations in which voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who shares, or is reasonably believed to share,

8

authority over the area." *U.S. v. Bell*, 2007 WL 2457846 * 4 (7th Cir., Aug. 31) (citing *Georgia v. Randolph,* 547 U.S. 103 (2006) and *Illinois v. Rodriguez,* 497 U.S. 177 (1990)). Whether consent to search is voluntary or the result of duress or coercion is a question of fact to be determined by examining the "totality of the circumstances." *Strache*, 202 F.3d at 985. The determination of whether consent to search was voluntary does not depend on the "presence or absence of a single controlling criterion but instead requires careful scrutiny of all the surrounding circumstances." *Id*. The burden is on the government to prove that a person's consent was voluntary. *Id*. at 984.

### A.  The Police Entrance into Valensia's Apartment.

Valensia argues that the police had no right to enter his apartment in the first place. He argues that the only information the police had when they arrived at the Canterbury Green complex was an anonymous tip telling them that drugs and a gun were present in the apartment. Musi testified that he did not recognize the caller and had no way to verify the accuracy of the information the caller gave him. Therefore, Valensia states that the tip was not reliable enough information on which to base probable cause. He states that "[i]nformation from an informant, which is unsupported by independent evidence, reliability or corroboration, cannot be trusted. Therefore, such information cannot be allowed to establish probable cause for a search and arrest." Defendant's Brief, p. 4.

But the anonymous tip was not used as probable cause to enter the premises. Rather,

9

once the tip was received, the officers decided to conduct a "knock and talk" investigation.[3]

Obviously, an uncorroborated anonymous tip would be insufficient to secure a search warrant. Apparently realizing this, Rivera decided that he, Musi, and Abels could conduct a "knock and talk" for the purpose of seeing if the occupants would speak with them and perhaps voluntarily let them into the apartment. Police officers do not need probable cause to conduct a "knock and talk." It is sufficient that they have suspicion that illegal activity may be occurring at the location. Courts have discussed the level of scrutiny to be applied to a "knock and talk" investigation. The key factor is whether the occupant or occupants "would feel free to decline the officers' request that they come to the door, or would feel free to otherwise terminate the encounter." *U.S. v. Adeyeye*, 359 F.3d 457, 461 (7th Cir. 2004) (citing *United States v. Jerez*, 108 F.3d 684 (7th Cir. 1997)). "The test is an objective one and requires consideration of the totality of the circumstances." *Id.* (citing *Jerez* at 690). In the *Jerez* case, police officers went to a motel room late at night and knocked repeatedly on a motel room door. At one point, a police officer yelled "Police. Open up the door. We'd like to talk to you." When they still received no response, one officer went to a window of the room and began knocking on it while shining his flashlight through the window. Another officer continued knocking on the door. Eventually, the occupant opened the door to the room and allowed the officers to enter. The Seventh Circuit determined that such action was very intrusive and transformed the situation from a simple "knock and talk" to an investigatory seizure that could only be justified if the officers had

---

[3] "Knock and talk" investigations are just what the term implies. Law enforcement, acting on little more than suspicion and no hard evidence, go to a residence, knock on the door, and hope to obtain additional information, receive permission to search the premises, or see evidence of a crime in plain view. See, e.g., *U.S. v. Ellis*, 2007 WL 2410063 (7th Cir., Aug. 27); *U.S. v. Punzo*, 208 Fed.Appx. 468 (7th Cir. 2006); *U.S. v. Bernitt*, 392 F.3d 873 (7th Cir. 2004).

reasonable suspicion that criminal activity was taking place. *Jerez*, 108 F.3d at 692. In contrast, in the *Adeyeye* case, police officers approached a motel room "in the middle of the afternoon" and "knocked only twice, stating at the time of the second knock that they could return later if it was an inconvenient time." The Seventh Circuit held that under those circumstances, the "knock and talk" was conducted in such a manner that "a reasonable person . . . would have felt free to terminate the encounter." The court held that this constituted a "consensual encounter" rather than a seizure. *Adeyeye*, 359 F.3d at 462 (citing *United States v. Cormier,* 220 F.3d 1103, 1109 (9th Cir.2000)) (encounter consensual where the officer knocked on motel room door but did not demand that the defendant open the door and was not unreasonably persistent in her efforts to obtain access to the room).

In the present case, the evidence shows that the officers knocked three times on Valensia's apartment door. When they first identified themselves as "maintenance," Valensia or someone else inside asked them to come back at a later time. When the officers responded by saying that it would only take a short time, Valensia then willingly opened the door. When he did, he was facing a uniformed police officer and another man with a badge on his chest. At this point, the officers requested permission to enter the apartment. There is no evidence that the officers used any intrusive measures, or forced their way in, or made any demands whatsoever.[4] When the officers asked Valensia if they could come into the apartment, the uncontroverted evidence is that he backed up slightly, opened the door wider, and gestured with his hand for

---

[4] As the government points out, "[t]he fact that the officers used a ruse–the assertion that they were 'maintenance'–to get the defendant to open the door does not alter this analysis." Government's Response, p. 9, n. 1 (citing *United States v. Salter*, 815 F.2d 1150 (7th Cir. 1987) and *Unites States v. Alejandro*, 368 F.3d 130 (2nd Cir. 2004)). In any event, Valensia does not raise an issue on this fact.

them to enter.[5]  While Valensia did not testify at the suppression hearing, McCain and Sellers did, and neither of them testified that the officers forced their way into the apartment or demanded to be let into the apartment.  Therefore, Valensia's argument that the officers did not have probable cause to approach his apartment or to conduct a "knock and talk" is without merit.

### B.  The Search of the Apartment.

Valensia also contends that once they were in the apartment, the officers conducted an illegal search and seizure.  According to Valensia, the officers had no consent to search the apartment and, since they had no warrant, the entire search and subsequent seizure of evidence was illegal.  This argument, however, is refuted by the evidence, including the testimony of Valensia's own witnesses–McCain and Sellers.

First, as the government argues, the officers testified that they encountered a powerful smell of marijuana even while they were still in the common hallway.  Then, when Valensia opened the apartment door, smoke and the smell of marijuana emanated from inside.  Once Valensia let the officers inside, Rivera testified that he saw a clear plastic bag containing a green, leafy substance in plain view near the kitchen.  At this point, the officers had probable cause to effectuate an arrest and conduct a protective search.  But before conducting a search and discovering the additional pounds of marijuana, the drug paraphernalia and the AK-47, the officers read *Miranda* rights to all four people in the apartment.  After that, they obtained verbal and written consent to search the apartment.

Valensia takes issue with the officers' recitation of the chain of events involving

---

[5]  Officer Abels testified that he heard Valensia make a verbal response indicating that the officers could enter the apartment.  Tr., p. 92.

12

*Miranda* warnings and consents to search.  Valensia claims that he did not consent to a search of the apartment because he did not sign the consent form while in the apartment.  He further argue that while Sellers *did* sign it, her consent was not voluntary.

Officers Rivera and Smith testified about the events leading up to the search.  At the outset, just after the officers entered the apartment, Rivera asked Valensia if there were any weapons in the apartment.  Tr., p. 22.  Valensia responded by saying that he had an "AK" in the bedroom.  *Id*., pp. 22, 87.  Valensia offered to retrieve the weapon, but Rivera told him no.  *Id*., p. 22.  Valensia and McCain were placed in handcuffs for officer safety, and Valensia, McCain, Sellers, and Elkins were informed of their *Miranda* rights.  *Id*., pp. 22-23, 66-68, 74-75, 90.  McCain confirmed in his testimony that all four people were informed of their rights "at the same time" while all were seated in the living room.  *Id*., p. 115.  At this point, Rivera asked for permission to retrieve the gun in order to clear it and make it safe, and Valensia consented to the request.  *Id*., p. 24.  Rivera and Abels went into the bedroom and the gun was on a closet shelf as Valensia had indicated.  *Id*., p. 24; Exh. 13.  Directly under the shelf where the gun was found, the officers saw several large bundles of marijuana in plan view.  *Id*., pp. 28-30, 64; Exh. 14.  In addition, the door to the bathroom was open and the officers saw, again in plain view, a large bowl with marijuana residue in it, a scale, a ledger book, and some wrapping paper.  *Id*., pp. 27-29; Exh. 13.

As soon as the officers entered the apartment and Rivera saw the small bag of marijuana near the kitchen, they had probable cause to arrest Valensia.  Also at that point, they had a legitimate reason to conduct a protective sweep for officer safety.  But Rivera actually asked Valensia if there were any weapons in the apartment and Valensia volunteered that there was a

13

gun in his bedroom. The officers secured the individuals in the living room and went to retrieve the weapon. While doing so, they saw the bundles of marijuana and the items in the bathroom–all in plain view. As the government points out, "[i]n the process of clearing the firearm, the marijuana came into 'plain view' and subject to seizure without a warrant." Government's Response, pp. 10-11 (citing *Horton v. California*, 496 U.S. 128 (1990)) (evidence in plain view may be seized without a warrant even if the police expected to find it). By agreeing to permit the officers to retrieve the gun from his closet, Valensia consented to their presence in his bedroom and bedroom closet. Once there, the bundles of marijuana on the floor were in plain view. Under these circumstances, no search warrant was required before the officers could seize all of the contraband.

In addition to Valensia's consent to allow the officers into his bedroom, a consent to search form was signed. Exh. 8. Officer Smith testified that Sellers and Valensia were sitting together on a couch in the living room, or at least very near each other. Tr., p. 99-101. Smith had a consent to search form and read the form to both individuals. *Id*., p. 100. Smith then "explained it to [Sellers], and then had her write in the address where it says 'located at.'" *Id*. Smith then had Sellers sign the consent form. *Id*. Rivera testified that he was present while this process was taking place. *Id*., p. 34. Rivera testified that once the consent to search form was read, both Valensia and Sellers indicated verbally that they understood it. *Id*., p. 35. Rivera testified that Sellers was upset and crying, and that Valensia told her everything would be fine and that she should sign the consent form. *Id*. Rivera testified that Valensia "sat there the whole time and was with her and helping her fill out the form." *Id*.

Rivera was "under the impression" that Valensia had signed the consent form at the same

14

time Sellers did, but discovered later that it contained only Sellers's signature. *Id*. So, when Valensia was in custody at the police station, Rivera showed him the consent form again and Valensia signed it at that time after acknowledging that he had given verbal consent to permit a search of the apartment. *Id*.; Exh. 8. Thus, Sellers signed the consent form at the apartment and the officers were permitted to search pursuant to that written consent.

Valensia argues that Sellers's consent was not actually voluntary. He argues that she only signed the form because some officer told her that if she did not sign it, Childrens' Protective Services ("CPS") would be contacted and would take her child away. Defendant's Brief, pp. 6-7. He also maintains that Sellers has a learning disability and argues (or at least implies) that she was incapable of understanding what she was signing. *Id*., p. 6.

Sellers did testify that she had some sort of learning disability. Tr., pp. 105-106. She said that she "can't write very well and spell very well." *Id*., p. 105. She testified that she went through the 10th grade in school. *Id*. In addition, Sellers testified that one of the officers, whom she could not identify, told her that if she cooperated and signed the form, her child would not be taken from her by CPS. *Id*., p. 109. Sellers testified that she would not have signed the form but for the fact that she felt "threatened" by the discussion about CPS. *Id*.

On cross-examination, however, Sellers admitted that by the time she signed the consent to search form, some of the drugs and the weapon had already been discovered. *Id*., p. 111. She also admitted (rather reluctantly, the court notes) that Valensia was sitting next to her and told her that everything would be alright, that he would "take responsibility," and to go ahead and sign the consent form. *Id*.

Valensia's arguments that there was no voluntary consent given to the officers to search

15

the apartment are not valid.  He does not take issue with the fact that he admitted to Rivera, right after the officers entered his apartment, that there was a weapon in his bedroom closet.  He also does not take issue with the fact that he agreed to allow the officers to retrieve the weapon.  Finally, he does not challenge the officers' testimony that bundles of marijuana were in plain view in the closet directly underneath the gun.  Therefore, the evidence clearly shows that Valensia consented to at least a limited search of his premises, and that the marijuana was discovered in plain view during that consensual search.  Therefore, all of the contraband present in the apartment was subject to seizure at that time and no warrant was required.  Even if, for the sake of argument, there could be some factual dispute about Valensia's consent to allow the officers to retrieve the AK-47, Sellers signed a consent to search form.  And for the reasons just discussed, his contention that her consent was not voluntary or that she did not comprehend what she was doing are unavailing.

### C.  The Videotaped Interview of Valensia at the Police Station.

Valensia also challenges the legality of the videotaped interview that took place at the police station after he was arrested, even though he signed another waiver of rights form prior to giving the interview.  Exh. 9.  Valensia maintains that his arrest was illegal in the first place, which rendered "tainted" the voluntariness of his statements during the videotaped interview.  Defendant's Memorandum, Docket at 24, p. 2.  Valensia also argues that his waiver of rights was not voluntary, since he was worried about the alleged threat officers made concerning CPS.  Defendant's Brief, p. 8.

16

The government responds by arguing that Valensia's arrest was supported by probable cause.  Government's Response, p. 14.  First, Rivera saw a bag of marijuana in plain view as he entered the apartment.  There was a strong smell of marijuana inside and outside the apartment.  Valensia admitted to the officers as soon as they entered the apartment that he had been smoking marijuana.  See Tr., p. 21.  And Valensia admitted to officers that he had a weapon in his closet and gave his consent for them to retrieve it, at which time they found a large quantity of marijuana in plain view in the closet.  Clearly, the officers had probable cause to arrest Valensia from the moment they entered the apartment, and certainly a very short time later after the gun and additional marijuana were discovered.

In addition, the government points out that "Valensia was advised of and waived his *Miranda* rights three separate times in less than [two] hours: (1) first orally after he admitted there was a weapon in the apartment at approximately 10:42 a.m. (Tr. p. 22-24); (2) a second time at 11:35 a.m. on a written form where he again agreed to speak with officers (Tr. P. 32, Exh. 15); and a third time at the police station on videotape at approximately 12:30 p.m. when Valensia again agreed to speak with Officer Rivera and acknowledged being advised of and having waived his rights at the apartment (Exhs. 9 and 10)."  Government's Response, p. 14.  For these reasons, the court finds that Valensia's arrest was not illegal, that he voluntarily waived his *Miranda* rights on more than one occasion on March 7, 2007, and that all the statements he made during his videotaped interview were voluntary and not obtained illegally.

In support of his second argument, Valensia references a portion of Sellers's testimony.  During direct examination, Sellers testified that while Valensia is not the father of her young child, he nonetheless treats the child as his own.  *Id*. (quoting Tr., p. 106).  Valensia then makes

17

the argument that because he treated Sellers's child as his own, he was so concerned about the "threat" that CPS would take the child that "he had no alternative but to answer each and every one of the questions put to him by the law enforcement officers" while at the police station. *Id.* This argument is completely without merit.

There is no evidence that any alleged "threat" concerning the involvement of CPS had any detrimental impact on Valensia or somehow rendered him so emotionally distraught that he could not make a knowing and voluntary waiver of his rights before agreeing to speak with the officers at the police station. There is only a bald assertion to that effect in his pleadings.[6] Furthermore, Valensia stated in his videotaped interview that no threats or coercion were used to obtain his cooperation. Accordingly, the evidence of Valensia's voluntary (and repeated) waiver of his *Miranda* rights is unrefuted.

Finally, the court notes that Rivera, Musi, Smith, and Abels testified credibly at the hearing on May 25, 2007. This is true not only with respect to the issue of the voluntariness of Valensia's videotaped statement, but also with respect to the other facts of the case. The testimony of all four of these individuals was consistent. Sellers's testimony was rather hesitant and not entirely credible in many respects, especially with regard to the facts surrounding the

---

[6] As stated earlier, Valensia did not testify at the suppression hearing. His attorney offered a "proffer" of what his testimony would be if he did take the stand. Tr., pp. 121-123. However, the court gives no weight to this proffer since Valensia was not subject to cross-examination. The court stated this position on the record during the hearing. *Id.*, p. 124. The court also feels compelled to point out that Valensia's assertion that his concern for Sellers's young child caused him great distress is hardly credible. It is undisputed (in fact, Valensia admitted) that he and the other occupants of the apartment were smoking marijuana on the morning of March 7, 2007, and that two young children (Sellers's and Elkins's) were present in the apartment at the time. Thus, by his own admission, Valensia was consuming a controlled substance in the presence of two young children, including the one he allegedly "treats as his own."

consent to search form and whether she knowingly and voluntarily signed it (which, as discussed above, the court finds that she did).

## CONCLUSION

For all of the reasons discussed herein, the Motion to Suppress filed by the Defendant, Carlos Valensia, is DENIED.

Date: October 11, 2007.

                                            /s/   William C. Lee
                                                   William C. Lee, Judge
                                                   United States District Court